ST. LOUIS REALTY FUND, a Missouri Limited Partnership, and David Fingerhut and Marilyn Fingerhut, and Harold Harper and Janet Harper, and James Jokerst and Cheryl Jokerst and St. Louis Realty Fund, Inc., Plaintiffs-Appellants,

v.

**MARK TWAIN SOUTH COUNTY BANK 21, Defendant-Respondent.**

No. 44916.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 29, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Denied May 13, 1983.

Application to Transfer Denied
June 30, 1983.

Claude Hanks, Leonard R. Yocum, St. Louis, for plaintiffs-appellants.

Douglas Lee Burdette, Popkin, Stern, Heifetz, Lurie, Sheehan & Chervitz, St. Louis, for defendant-respondent.

GAERTNER, Judge.

This action involves the reformation of a bank note to express the mutual intent of the parties. Plaintiffs appeal a judgment in favor of defendant bank. The primary question on appeal is whether the interest rate on the bank note is set at 13½% or whether it floats up or down with the bank's prime rate.

St. Louis Realty Fund, a Missouri limited partnership and a plaintiff in the action, was formed in 1979 to purchase the Verde Vista Apartments, a major apartment complex located in Jefferson County. The partnership contracted to purchase the Verde Vista Apartments subject to obtaining financing from a lending institution. The general partners of the partnership, all plaintiffs here, were experienced in real estate transactions and financing. David Fingerhut is an attorney and licensed real estate broker who has borrowed money on 30 to 35 properties. Harold Harper is a tax consultant and financial adviser with extensive experience in real estate investments. Similarly, James Jokerst is an experienced investor in real estate and an experienced borrower.

In August, 1979, David Fingerhut on behalf of the partnership initiated negotiations with defendant bank for the purpose of securing long term financing for the Verde Vista project. On August 14, 1979, David Fingerhut met with Jack Givens, the Bank's president, and Irene Looker, an assistant vice president, to discuss a long-term

loan. Givens explained to Fingerhut that it is a very strong policy of the bank to be a floating rate lender for commercial real estate loans. Negotiations then ensued as to what increment above prime rate the bank would entertain a loan request for the project. A tentative agreement was reached that if plaintiffs were able to generate $40,000 worth of deposits at the bank, the bank probably could grant a floating rate loan at prime plus 1½% interest subject to approval by the bank's executive loan committee.

The defendant bank requested and received financial information from the partnership about the Verde Vista project, and negotiations continued. Irene Looker was the bank officer with whom the partnership primarily dealt. The negotiations resulted in the bank issuing to the partnership a letter of commitment dated August 22, 1979, which states in pertinent part:

Gentlemen:

This letter is to notify you that your request for a loan in the amount of $385,000 in the name of St. Louis Realty Fund (a Missouri limited partnership) to purchase Verde Vista Apartments, buildings A, B and C has been approved. The conditions of our commitment are as follows:

.    .    .    .    .

2) The interest rate on this note is to be initially set at prime plus 1.5% with a required compensating balance of $40,000. As the compensating balances reach 20% of the loan amount, the interest rate shall be, at the sole discretion of the Bank, decreased to prime plus 1%. The term of the note will be for a period of five years commencing on the date of the note.

3) The interest and principal on this loan are to be paid on a monthly basis and in accordance with a 15 year amortization schedule.

.    .    .    .    .

Upon request by plaintiffs for a 20 year amortization schedule, Irene Looker, on behalf of the bank, amended the commitment in a letter to the partnership dated September 4, 1979, as follows:

This letter is to serve as a formal amendment to our commitment letter dated August 22, 1979.

The loan in the amount of $385,000.00 requested to purchase Verde Vista Apartments shall be repaid based on a 20 year amortization schedule. All other terms and/or conditions of the loan shall remain as originally stated in the first commitment letter.

The general partners—Fingerhut, Harper, and Jokerst—signed the commitment letter and amendment on September 7, 1979. Closing was set for September 17, 1979.

On or about September 13, 1979, Looker telephoned David Fingerhut to tell him the loan documents including the note at issue here were ready for signature. Looker testified that she then discussed the terms of the note with Fingerhut. Looker stated that the additional typed term at the bottom of the printed note would read "interest payment monthly and a principal payment of $1,604.19 beginning 11–1–79." Fingerhut demurred to this language. To eliminate bookkeeping difficulties, he requested a fixed monthly payment whereby the bank would make adjustments on each payment, crediting the appropriate sums to interest and principal. To accommodate plaintiffs' request, the bank used liquid paper to "yellow out" the additional term on the note as it was typed in before Fingerhut's request, and had typed in its place the words "interest and principal payment of $4,648.39 due monthly beginning 11–1–79." This monthly payment was arrived at considering current interest rates and some cushion for upward movement of the prime rate.

On September 17, 1979, plaintiffs Fingerhut, Harper and Jokerst met with Irene Looker for the signing of all documents related to the loan, including the note. At the closing, Looker testified that she went through the facts; the amount of the note, the fact it was a demand note, the fact that it was for $385,000 at prime plus 1½% interest, with monthly payment allocated first to

interest and then to principal. All the plaintiffs signed.

Plaintiffs Fingerhut, Harper and Jokerst testified that they understood the interest on the note would be set at prime plus 1½% "as of the date of closing," but the interest rate could float down if the prime rate fell. Plaintiffs Harper and Fingerhut testified that no one at the bank told them that the interest could float up with the prime rate.

The caption on the note says "NOTE (Variable Rate)" and states in part:

"on demand, and if no demand is made then on the 17th day of September, 1984, the undersigned . . . promise to pay to the order of [defendant bank $385,000] with interest thereon from date payable monthly beginning November 1, 1979 at a per annum rate equal to P + 1½ per cent in excess of the from time to time prime per annum rate of interest of the bank for 90-day loans to its most credit-worthy responsible commercial and industrial borrowers (herein called the "Prime Rate"), which interest rate shall change as and when such Prime Rate shall change, but not less than 0 per cent per annum. . . ."

The additional term typed by Looker at the bottom of the note states:

"Interest and principal payment of $4,648.39 due monthly beginning 11–1–79."

Both plaintiffs in their second amended petition and defendant in its counterclaim assert that this "additional term" constitutes a mutual mistake in that it does not accurately reflect the true agreement of the parties. Both parties sought reformation of the note to conform to the parties true intent. The trial court succinctly stated the issue presented by the ambiguity of the additional typed term:

"Did the parties agree, as plaintiffs allege, that if interest rates went down, defendant would charge plaintiffs a lower rate of interest and allocate a larger portion of the monthly payment to principal, but if interest rates rose, defendant would not raise the plaintiffs rate of interest? Or did the parties agree, as defendant alleges, that interest would fluctuate with prime, remaining fixed at 1.5% over prime, and that fixed monthly payments made by plaintiffs would be credited first to interest and then to principal?"

After trial to the court, judgment was entered against plaintiffs and in favor of defendant bank. The Order of the trial court provides

"the note is reformed so that its terms are as follows:

a. The note in the principal amount of $385,000.00 is payable on demand or if no demand be made, then on September 17, 1984;

b. The note bears interest at one and one-half (1½) percent above the prime rate, as defined in the note, commencing on September 17, 1979;

c. The plaintiffs are required to make monthly payments of Four Thousand Six Hundred Forty-Eight Dollars and Thirty-Nine Cents ($4,648.39) with all payments credited first to interest then to principal."

The scope of review in a court-tried case is set out in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), which provides that the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

Principles relating to reformation of written instruments are well recognized. Reformation is a form of equitable relief which allows parties to a contract to conform an instrument to what the parties actually intended. It necessitates a prior valid contract. The principal ground for reformation is mutual mistake whereby both parties have memorialized in writing what neither actually intended. *Rainey v. Foland,* 555 S.W.2d 88, 91 (Mo.App.1977). A written instrument will be reformed only upon clear, cogent and convincing evidence, which leaves no room for reasonable doubt. This degree of proof relates not only to the

existence of a mutual mistake but also to the establishment of the actual agreement which is alleged to have been made. *Dehner Urban Redev. Corp. v. Dun & Brad.,* 567 S.W.2d 700, 704 (Mo.App.1978).

■ The first issue on appeal is that the trial court erred in reforming the note so that it bears interest at 1½ percent above the fluctuating prime rate. After a review of the record and transcript, we find no error.

In attempting to ascertain the intent of the parties as to the meaning of the note's "additional term," the trial court heard testimony from Jack Givens, president of defendant bank, who met with plaintiff David Fingerhut to discuss a loan to Fingerhut's partnership. Givens testified that he made it very clear to Fingerhut that the bank gave only floating rate loans to commercial real estate projects, and Fingerhut agreed to a floating rate loan at prime plus 1½%. Irene Looker, an Assistant Vice President of the bank, testified that she had discussed with Fingerhut a floating rate of interest loan at a fixed monthly amount whereby if the prime rate moved up the bank would apply more to interest and less to principal. There was evidence that four days prior to closing, Looker sent a memo to the note tellers at the bank stating that the interest rate on the loan was a floating rate at prime plus 1½%.

In addition, the commitment letter of August 22, 1979, stated that the interest rate on the note would be "*initially* set at prime plus 1.5%" (emphasis added), suggesting that the rate was not to be permanently fixed. The note itself states clearly that the interest rate would be P + 1½% "which interest rate shall change as and when the prime rate shall change." There was evidence that three days after closing Looker discussed with Harper the need to adjust the monthly payment on the note upward to $4,900. This adjustment was due in part to the expected increase in the prime rate and to assure that the current interest due on the note would not exceed the monthly payment. A letter to this effect was sent to the partnership on September 20, 1979.

Moreover, after execution of the note, plaintiffs acted in accord with the bank's interpretation of the note's floating interest rate. There was testimony that the partnership made payments of $4,900 monthly as the cash flow allowed. The prime rate continued to rise between September 17, and November 23, 1979. On the latter date Harper approached Looker with a proposal to fix the interest rate on the note at 14½% for six months. This proposal from the plaintiffs implicitly recognized the floating nature of the P + 1½% rate. The bank responded with a proposal in a letter dated December 4, 1979, to set the note rate at 16% with the understanding that plaintiffs would initiate a search for other long-term financing. This proposal was not accepted by the partnership.

Plaintiffs filed suit for reformation of the note on August 28, 1980. At no time from the date of closing, September 17, 1979, to the bringing of this suit did the plaintiffs either object to the upward float of the P + 1½% interest rate charged on the note or inform the bank that it was plaintiffs' understanding that the interest rate was fixed at 13½%.

Applying the standard of proof set out in *Dehner Urban Redev. Corp.,* 567 S.W.2d at 704, the evidence more than sufficiently supports the trial court's order reforming the note to have a floating interest rate at prime plus 1½% and the $4,648.90 monthly payment credited first to interest then to principal. Appellant's first point has no merit.

■ Plaintiffs next contend on appeal that the trial court erred in decreeing the note to be reformed as a demand note in that there was not sufficient evidence to support such a decree.

The very first sentence of the body of the note begins "On demand, and if no demand is made, then on the 17th day of September, 1984. . . ." Plaintiffs contend the additional typed term, which requires interest and principal be paid monthly, eliminates this express demand nature of the note and turns it into a note payable at a definite

time with installment payments. We find this contention has no merit.

The first sentence of the note unequivocally states the note's demand nature. The fact that the note's additional term requires plaintiffs to make monthly payments of interest and principal, standing alone, in no way detracts from the demand characteristic of the note. Moreover, the record is replete with evidence that all the parties treated the note as a demand note.

Looker testified that at the closing she went through the facts of the transaction with plaintiffs Fingerhut, Harper, and Jokerst, including the fact that the note was a demand note. Furthermore, all three of these plaintiffs admitted in testimony that they realized that the note was a demand note subject to call by defendant at any time.

The express demand language of the note together with plaintiffs' like understanding constitutes convincing evidence that this was the true intent and actual agreement of the parties. As all the parties treated the note as a demand note, we have no reason to upset their expectations here. Plaintiffs' contention has no merit.

Plaintiffs next contend on appeal that the trial court erred in reforming the note in that there was no mutuality of mistake. We find no error.

Statements that relief will not be given on the ground of mistake unless the mistake is "mutual" are common both in texts and in court opinions. However, Corbin states that "such a broad *generalization* is misleading and untrue." 3 *Corbin on Contracts* § 608, p. 669 (1960).

> "Cases do not always submit readily to be classified with either 'mutual mistake' or 'unilateral mistake.' And even when they do submit, the solution does not mechanically follow in accordance with a separate set of rules for each class. Very often relief has been and will be, granted where the mistake is unilateral. And relief is not necessarily granted, even though the mistake is mutual."

*Id.* at p. 670.

Here both plaintiffs in their second amended petition and defendant in its counter-claim acknowledge that the additional typed term on the note did not accurately reflect the true agreement between the parties. In this sense there was a mutual mistake in reducing the agreement to writing, and both parties seek reformation on this ground. The true dispute centers on what was the actual agreement, and is reformation appropriate relief.

■ Corbin states that the factors and circumstances accompanying the mistake must always be considered in determining the proper relief. 3 *Corbin on Contracts* § 608, p. 677 (1960). Reformation of a written instrument in equity will be decreed when the words that it contains do not correctly express the meaning that the parties agreed upon, as the court finds to be convincingly proved. 3 *Corbin on Contracts* § 614, p. 713 (1960). The standard for granting reformation has been described as follows:

> "Whatever may be the form of the transaction ... and whatever may be the explanatory theory as to when and how the contract became binding, a court will not decree reformation unless it has *convincing evidence* that the parties expressed agreement and an intention to be bound in accordance with the terms that the court is asked to establish and enforce." (emphasis added)

*Id.* at p. 725.

■ The trial court in the instant case carefully reviewed the evidence adduced at trial, and concluded that the evidence is clear, cogent and convincing enough to leave no room for reasonable doubt as to the actual intent and agreement of the parties. The court, thus, properly reformed the note to be a prime plus 1½% interest note payable on demand. *American Family Mutual Insurance Co. v. Bach*, 471 S.W.2d 474, 477 (Mo.1971). This judgment is clearly supported by substantial evidence and will not be disturbed here. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ Alternatively, plaintiffs argue that since the note was drafted by the bank,

any ambiguity contained therein must be construed against the bank. This rule of construction is employed as a last resort when other available data bearing on the agreement shed no light on actual intent or meaning. *Rouggly v. Whitman,* 592 S.W.2d 516, 523 (Mo.App.1979). It has no application here. The evidence of the negotiations between the bank and defendants, the express terms of the commitment letter and the note, and the conduct of the parties after execution clearly show the parties' intent—that the note bears interest at 1½% above prime rate and the monthly payments of $4,648.39 be credited by the bank first to interest and then to principal. The trial court here properly looked to all the facts and external circumstances surrounding the contract in its attempt to determine this intent. *Rouggly v. Whitman,* 592 S.W.2d at 519.

■ Plaintiff's next point on appeal is that the trial court erred in finding that $30,878.45 in accrued interest is presently unpaid under the note in that there is no substantial evidence to support such a finding. A thorough search of the record and transcript shows evidence that the prime rate was 13% on the date of the note's execution, September 17, 1979, and that the prime rate was 20% on the date of trial, August 5, 1981. There was no evidence as to the prime rate fluctuations during the two year interim period. Absent such a showing the trial court's finding that $30,878.45 in accrued interest is unpaid is not based on substantial evidence. This part of the judgment must be reversed and remanded to allow the trial court the opportunity to hear additional evidence sufficient to support its finding. *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976).

■ Plaintiffs' next point on appeal is that the trial court erred in admitting two pieces of documentary evidence in that they were inadmissible hearsay and self-serving. The documents at issue were a credit summary of plaintiff St. Louis Realty Fund and the plaintiff partners, and an internal memorandum. Both documents were prepared by Looker for the Internal use of the defendant bank. The credit summary was prepared for the purpose of submitting plaintiffs' loan application to the bank's executive loan committee. The internal memorandum was to the note tellers informing them of the terms of plaintiffs' loan. Looker testified as to the identity of the documents, their mode of preparation, that Looker herself prepared them, that the documents were prepared at or near the time of the execution of the note, and that the documents were prepared in the normal course of business. The two documents, therefore, were proper evidence under the business records exception to the hearsay rule, § 490.680, RSMo 1978.[1] The trial court is vested with large discretion in determining whether the statutory requirements for admission of these business records have been satisfied and we have no reason to disturb that ruling here. *Rossomanno v. Laclede Cab Co.,* 328 S.W.2d 677, 683 (Mo. banc 1959); *State v. Light,* 636 S.W.2d 157, 159 (Mo.App.1982).

■ Plaintiffs also contend that the documents are self serving and therefore not admissible. The general rule regarding self-serving documents is that "declarations of a party favorable to himself *which are not part of the res gestae* are hearsay, self serving and inadmissible as evidence in his favor." *Fallert Tool and Engineering Company v. McClain,* 579 S.W.2d 751, 758 (Mo. App.1979) (emphasis added). Here it is undisputed that the documents were prepared during the course of the loan negotiations and directly prior to the actual execution of the note. The documents were also prepared in the normal course of the bank's business. As such, the documents were clearly

---

1. The business records exception, as codified in § 490.680, RSMo 1978, provides:

    A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

part of the *res gestae* of the note transaction and were properly admitted into evidence. *Fallert Tool & Engineering Co. v. McClain*, 579 S.W.2d at 758.

■ Plaintiffs' next point on appeal is that the trial court erred in ignoring the uncontradicted testimony of plaintiff Harper to the effect that plaintiffs had secured a firm commitment from another lender for a fixed rate of interest loan for the Verde Vista project. It is well settled that the trial court is the arbiter of the facts in a jury-waived case and it must judge the credibility of the witness. It may believe or disbelieve oral evidence even when wholly uncontradicted. *Miller v. Gayman*, 482 S.W.2d 414, 420 (Mo.1972); *Dambach v. James*, 587 S.W.2d 640, 643 (Mo.App.1979).

■ The trial court, thus, was acting within its discretion in discounting Harper's oral testimony, especially in view of the fact that two documents offered by plaintiffs to corroborate Harper's testimony fell far short of the mark.

The first document offered by plaintiffs is a worksheet prepared by Harper with various financing contingencies for the Verde Vista project. The worksheet does not indicate any binding commitment from another lender to finance the project. The second document offered by plaintiffs is a blank, unsigned and undated "application for mortgage commitment" upon which Harper claims to have written notes while discussing the possibility of a loan with another lender. The blank application for a mortgage commitment in no way corroborates Harper's claim that he had obtained a *firm* commitment for a fixed rate loan from another lender. Rather, the blank application suggests that plaintiffs had not even firmly applied for such a loan. If a firm application had been made, a formal, complete application would have been offered into evidence instead of the blank application here. In light of these circumstances and plaintiffs failure to offer corroborating evidence, the trial court reasonably disbelieved Harper's testimony in total even though it was wholly uncontradicted, and we have no reason to disturb the exercise of

that discretion here. *Miller v. Gayman*, 482 S.W.2d 414 (Mo.1972); *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

■ Plaintiffs further contend the trial court erred by including in its findings a phrase contained in an exhibit to which an objection had been sustained. At issue here is the credit summary which we have held admissible under the Uniform Business Records Act and as a part of the transaction itself. Upon plaintiffs' objection at trial, the court ordered stricken from this document the introductory phrase, "[a]ccording to the agreement between us and the borrower ..." In its findings, the trial court included that phrase in quoting a section of the credit summary. Plaintiffs do not point out wherein and why the inclusion of this phrase in one of the court's forty-one findings of fact was in any way prejudicial, but rather plaintiffs ask us to speculate that the court might have considered the stricken phrase. Thorough review of the extensive findings of fact and the erudite conclusions of law made by the trial judge eliminates any possibility of such a conjectural conclusion. Nowhere in its conclusions does the trial court mention the credit summary. The court clearly predicated its conclusions upon the conduct of the parties, taking particular note of plaintiffs' Exhibit 8 in which Harper suggested a consentual amendment to put a "floor" and a "ceiling" on the variable interest rate. The court also noted plaintiffs' acquiescence in the increased monthly payments in order to cover increased interest rates. The expressed rationale underlying the trial court's conclusions clearly refute any possibility that the court was influenced by the stricken phrase.

Plaintiffs remaining point on appeal also quibbles with the language of the trial court's conclusions. The court held "[p]laintiffs offered not a scintilla of written proof of their contentions." Plaintiffs charge error in that conclusion. They offered and the court received nine documentary exhibits in evidence. They interpret the court's statement to mean their exhibits were not considered to be evidentiary. However, the obvious import of the sentence is that the

exhibits did not support plaintiffs' contentions. After reviewing the record, including the exhibits, we find this conclusion of the trial court to be correct.

The judgment is affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.

SNYDER, P.J., and DOWD, J., concur.