**AMERICAN BANK OF PRINCETON, Respondent-Appellant,**

v.

**Harley STILES, Amber Stiles, Ed Stiles and Roxi Stiles, Appellants-Respondents.**

**No. WD 38056.**

Missouri Court of Appeals, Western District.

April 21, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1987.

Application to Transfer Denied July 14, 1987.

---

Tom Oswald of Oswald & Cottey, P.C., Kirksville, for the Stiles.

Wendell K. Koerner, Jr., St. Joseph, for American Bank of Princeton.

Before LOWENSTEIN, P.J., and MANFORD and BERREY, JJ.

MANFORD, Judge.

This action originally appeared before this court as two separate appeals. The appeals were consolidated by an order of this court on April 25, 1986, and therefore the appeals are herein disposed of as one.

The action was brought by American Bank of Princeton (hereinafter plaintiff),[1] in two counts: Count I for replevin of property secured under a note, and Count II for judgment on the note. The defendants, Harley Stiles, Amber Stiles, Ed Stiles and Roxi Stiles (hereinafter defendants), filed their answer and counterclaim alleging prima facie tort and intentional interference with a business expectancy. Plaintiff obtained summary judgment on its Counts I and II, and the court further awarded plaintiff attorneys' fees in the amount of $42,294.27.

The cause proceeded to trial on defendants' counterclaim. Defendants' count alleging prima facie tort was dismissed and the cause was submitted on intentional interference with a business expectancy. The jury returned a verdict in favor of defendants and awarded defendants $75,000.00 in actual damages, and $400,000.00 in punitive damages. The trial court entered its judgment on the verdict and both parties, following post-trial motions, filed their appeals. Affirmed in part and reversed in part.

Defendants challenge the trial court's order granting summary judgment on the note and on the replevin count, and raise three points which charge, in summary, that the trial court erred (1) in granting summary judgment because there remained genuine issues of material fact; (2) in overruling defendants' motion to strike the affidavits filed by plaintiff in support of its motion for summary judgment because the affidavits were defective and in violation of Rule 74.04(e); and (3) in overruling defendants' motion for leave to file answers to plaintiff's request for admissions out of time.

Plaintiff challenges the judgment of the trial court on defendants' counterclaim and raises eight points which charge, in summary, that the trial court erred (1) in overruling plaintiff's motion for a directed verdict because there was not sufficient substantial evidence to make a submissible case that plaintiff wrongfully interfered with a valid business expectancy; (2) in submitting an instruction on punitive damages because there was not sufficient substantial evidence to support the submission of a punitive damage instruction; (3) in submitting an instruction on punitive damages because said instruction improperly

1. Because there is a cross-appeal and for reasons of clarity, the parties will be referred to as plaintiff and defendants rather than appellant/respondent and respondents/appellants.

defined the degree of malice applicable to an action for tortious interference with a business expectancy; (4) in overruling plaintiff's motion in limine to exclude evidence of the summary judgment entered on plaintiff's petition because such evidence was not relevant to any issue of defendants' counterclaim and was highly prejudicial; (5) in admitting, over plaintiff's objection, defendants' Exhibit No. 13, a listing of amounts of money received for cattle sold by defendants between January, 1984, and May, 1985, because such evidence was not relevant to any issue of defendants' counterclaim and was highly prejudicial; (6) in admitting, over plaintiff's objection, deposition testimony of defendants' witness concerning the witness' understanding and belief because such testimony constituted speculation, opinion and conclusion, and was not relevant; (7) in submitting defendants' verdict-directing instruction because there was not sufficient substantial evidence to support the submission of the instruction and because the instruction did not require the finding of a "valid" business expectancy; and (8) in excluding testimony of plaintiff's witness because such testimony was offered to show the state of mind of plaintiff's employees and did not constitute hearsay.

The pertinent facts are as follows:

Defendant Harley Stiles, and his wife, Amber Stiles, had started in the Angus cattle business in approximately 1967. They had a cow/calf operation in which they would breed heifers and cows and sell the calves. Harley had banked with plaintiff since he was in high school. To finance the cattle operation, defendants had an operating loan with plaintiff which was a line of credit against which advances would be made during the year as necessary for defendants' operation. When defendants sold cattle, they would apply the proceeds against the note. The note, which was renewed annually, was secured with a mortgage on personal property which included cattle, machinery, equipment, and feed on hand. The note was not secured by any real estate. The note carried a variable interest rate of 15% which was to be adjusted every quarter to ½% above plaintiff's "best commercial rate", to be determined by plaintiff. The note also provided that the maker would pay all costs of collection, including reasonable fees and expenses of attorneys. Defendants had also executed personal guaranties for the repayment of the note.

In 1979, Harley and Amber brought into the Angus business their son, Ed Stiles, and his wife, Roxi Stiles. Beginning in January, 1980, defendants submitted annual financial statements to plaintiff in the name of Stiles Angus Farms, a Partnership. Separate financial statements were also submitted by Harley and Amber, and Ed and Roxi. These financial statements were submitted every January and the operating note was renewed at that time. All documents connected with this line of credit were signed by Harley, Amber, Ed and Roxi Stiles, as partners.

The line of credit was renewed on January 11, 1983, at which time the line of credit was evidenced by a promissory note in the amount of $550,000.00. As of that date, $507,000.00 had been advanced. The major part of this was to refinance existing debt. On January 11, 1984, principal and accrued interest due under the note amounted to $619,000.00.

In November of 1983, the agricultural loan representative of plaintiff, Tony Hamilton, and two loan representatives from American National Bank of St. Joseph, made an annual inspection of defendants' operation. The St. Joseph representatives were involved because that bank had participated on the loan. At the date of the inspection, the loan account appeared to have a negative collateral margin, which means the collateral securing the note was valued at less than the amount of the note.

In January, 1984, Hamilton scheduled an appointment with defendants to review their account, which was the practice every January as the note became due. Harley and Ed went to the bank on January 12, 1984, at which time the note, which became due January 11, was in default. Instead of meeting with Hamilton, Harley and Ed met with Rex Brod, another agricultural loan

representative. At that meeting the three prepared updated financial statements which were to be signed by the four defendants at a later date.

Both Harley and Ed testified that at the January 12th meeting, Brod told them that their account had been "classified" and that they would have to get authority from the board of directors to get any additional funds. Harley and Ed also testified that at this meeting, Brod told them to sell some cattle because the bank would not advance any more funds to purchase feed for the cattle.

On cross-examination, Harley and Ed testified that at the January 12th meeting, Brod had told them to sell cattle in order to have some cash to apply to the debt and also so that the size of the herd would be reduced, thereby lowering operating costs. Plaintiff later introduced evidence that defendants were advanced $10,000.00 for operating expenses on that day on a separate note. At this meeting, another appointment was scheduled for January 19, 1984.

At the January 19th meeting, Harley and Ed again met with Brod. Brod informed Harley and Ed that additional collateral was necessary in order to renew the note. Harley and Ed testified that Brod requested a 60-day deed of trust on real estate owned by Harley and Amber, which was unencumbered, in order to renew the note. Harley refused to give plaintiff a deed of trust. Harley and Ed testified that Brod again told them to sell cattle to make some payment on the debt and reduce the size of the herd. They testified that again, Brod told them that the bank would not give them any more money to purchase feed for the cattle. Plaintiff later introduced evidence that on January 19, 1984, defendants were advanced $15,000.00 for operating expenses on another, separate note.

Ed testified that because of Brod's request that defendants sell cattle, Ed contacted an Angus Association representative, John Barton, on January 16, 1984, to seek assistance in finding buyers for defendants' cattle. On January 23, Ed was put in touch with a cattleman in Oklahoma, Tom Price. Price was interested in purchasing 100 to 150 Angus cows which he planned to artificially inseminate to a Brangus Bull in which he had an interest. Ed and Price discussed a price range of $700.00 to $900.00 per cow. Price was not interested in immediate delivery of the cows because he did not have room for them in Oklahoma, but was moving his cattle operation to a larger farm in Kansas where he would have room for them. Price suggested to Ed that he was only interested in purchasing the cows if someone would pasture, feed, and care for them and artificially inseminate them until approximately October or November of 1984. Price proposed to pay a management fee of $7.50 per head per month, and to pay rent for pasture and for feed during the eight or nine months involved.

Both Harley and Ed testified that they went to the bank on January 23, 1984, and discussed the Price proposal with Brod. (Defendants did not inform Brod of the identity of the potential buyer.) Their testimony was that Brod said the price sounded very good and that defendants could sell the cows but that they could not promise to care for the cows because defendants might not be in business until October or November of 1984. Harley and Ed also testified that Brod reiterated his request for a 60-day deed of trust on Harley's and Amber's real estate. Ed and Harley returned to the bank on several occasions after January 23rd to discuss the Price proposal with Brod, and they testified that each time Brod said they could sell the cattle but could not guarantee to care for the cows because they might not be in business, and that Brod repeated his request for a 60-day deed of trust.

Ed testified that he talked with Price on several occasions after January 23rd, and that he informed Price that they could sell the cattle but that they could not guarantee that they could care for the cows until October or November of 1984. The Price transaction was never consummated.

Price testified by way of a videotaped deposition that he was interested in purchasing 100 to 150 head of cows at a price range of $700 to $900 and that the sale

would be conditioned on the seller pasturing and artificially inseminating the cows until October or November of 1984, and that he was willing to pay rent for pasture, for feed and a management fee of $7.50 per cow per month. Price testified that he was of the opinion that defendants' cows were of the quality which he was looking for but that he would not agree to purchase the cows "sight unseen", but rather, if the defendants had agreed to care for the cows, Price would have traveled to Missouri to select the cows for purchase. Price admitted that he would not have necessarily purchased the defendants' cows upon traveling to Missouri and that he would not be bound to so purchase.

The evidence is uncontroverted that plaintiff had no contact with Price and that, in fact, plaintiff was not informed of the identity of the prospective buyer. The evidence is also uncontroverted that as of January 12, 1984, the note was in default and had a negative collateral margin.

On March 20, 1984, the note was still in default. Plaintiff contacted Harley and requested that defendants sign a 60–day extension of the note. Defendants complied with this request. Plaintiff requested the extension for the reason that plaintiff anticipated a visit from bank examiners, and that if the examiners found the note to be in default at the time of the examination, the examiners would have classified the loan, required plaintiff to deposit "matching funds" in a special "loan loss" account, and required plaintiff to take some action in regard to collecting the debt.

On February 1, 1984, Ed talked with another cattleman, Larry Cantrill, who was interested in purchasing some cattle. Two hundred fifteen head of cows were sold by defendants to Cantrill in late February at a price of $500.00 per head. The monies defendants received from the sale were applied to the note in question.

After May 20, 1984, the note was again in default, the 60–day extension having expired. On May 22, 1984, Harley and Ed met with Hamilton and bank president Jerry Goodin. At this meeting, Hamilton and Goodin proposed a two-year note at 8%

interest with no principal reduction required, but only if secured by a deed of trust on Harley's and Amber's real estate. Defendants rejected this proposal and on June 28, 1984, plaintiff called the note.

Any additional facts will be disclosed *infra* as pertinent to the points on appeal.

Defendants' first point challenges the trial court's order of summary judgment on plaintiff's petition and charges that the trial court erred in granting summary judgment because there remained genuine issues of material fact, to wit: whether defendants owed to plaintiff the principal sum of $311,347.74 and interest in the amount of $111,595.04; whether interest was accruing at a rate of $132.22 per day on defendants' indebtedness to plaintiff; the rate of interest on the note throughout each quarter under the variable interest rate feature; whether $42,294.27 is a reasonable amount for attorneys' fees; and whether the $42,294.27 in attorneys' fees was an expense necessarily incurred by plaintiff in furtherance of collection of the note.

■ Summary judgment is appropriate when pleadings, depositions, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact. A genuine issue of fact exists whenever there is the slightest doubt about the facts, and the burden is on the moving party to show by unassailable proof that there is no genuine issue of fact. *Commerce Bank of Fenton N.A. v. B.P.J. Enterprises, Inc.,* 659 S.W.2d 615, 617 (Mo. App.1983).

In support of its motion for summary judgment, plaintiff filed the affidavit of Merrill "Tony" Hamilton which purported to set forth the amount of principal and interest due. Attached to the affidavit was a copy of the note in question. Although defendants admit that the note was in default, they argue that plaintiff did not sustain its burden of proof as to how the interest was calculated. Specifically, defendants cite to the portion of the note indicating the variable interest rate feature, and argue that under the note there is no indication of how the interest was ad-

justed quarterly. Therefore, following defendants' argument, it is impossible to determine the rate at which interest is accruing each quarter, whether payments made by defendants were properly applied to interest and principal, the current balance of interest and principal owed, or the daily rate of accrual of interest. Defendants cite *St. Louis Realty Fund v. Mark Twain South County Bank 21*, 651 S.W.2d 568, 575 (Mo.App.1983), in support of their argument.

In *St. Louis Realty Fund*, the court held that the trial court's finding that $30,878.45 in interest had accrued and was owing on a note with a variable interest rate feature was not supported by substantial evidence where there was no evidence as to the prime rate fluctuations during the course of the term of the note. Plaintiff argues that *St. Louis Realty Fund* does not apply herein because the underlying action in that case was for the reformation of a promissory note to reflect an alleged oral contract as to the amount of the interest rate to be applied to the note. Plaintiff argues that in *St. Louis Realty Fund*, fluctuations in the prime rate were to determine the amount of interest to be paid. Therefore, fluctuation in the prime rate would be one of the central issues in that case.

This court agrees with plaintiff that *St. Louis Realty Fund* is distinguishable. As this court interprets that case, both parties sought reformation of the note to reflect the true intent of the parties. The note indicated a variable interest rate at 1½% above the fluctuating prime rate. The debtors argued that the parties had intended that the note's interest rate would fluctuate downward if the prime rate went down, but would not fluctuate upward if the prime rate went up. The creditor, on the other hand, argued that the parties intended that the note's interest rate would fluctuate with the rise and fall of the prime rate. The debtors were paying a fixed amount monthly and that payment was to be credited first to interest then to principal. Therefore, a change in the prime rate, thereby changing the note's interest rate, would alter the amount applied monthly to interest versus principal. There is no indication in the text of the opinion that either party offered any evidence as to how much interest had accrued.

The court in *St. Louis Realty Fund* held that the trial court correctly ruled that the note's interest rate was to fluctuate up and down with the change in the prime rate. However, the court stated:

> A thorough search of the record and transcript shows evidence that the prime rate was 13% on the date of the note's execution, ... and that the prime rate was 20% on the date of trial, ... There was no evidence as to the prime rate fluctuations during the two year interim period. Absent such a showing the trial court's finding that $30,878.45 in accrued interest is unpaid is not based on substantial evidence.

Furthermore, *St. Louis Realty Fund* was reviewed under the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), and the judgment could not be sustained if not supported by substantial evidence.

The present case reaches this court on a different posture. Summary judgment must be sustained if there remains no genuine issue of a material fact and the moving party has shown by unassailable proof that it is entitled to judgment as a matter of law. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party ... If the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ When a motion for summary judgment is made and supported by affidavits and/or depositions, an adverse party may not rest upon mere allegations or denials in his pleadings but must, in order to overcome the motion, by affidavits or otherwise, set forth specific facts showing a

genuine issue for trial. *See Warner v. Berg*, 679 S.W.2d 913, 914 (Mo.App.1984).

Defendants' point has been squarely ruled against them in *Mercantile Trust Co. v. Carp*, 648 S.W.2d 920, 925 (Mo.App. 1983), wherein that court, affirming the trial court's order of summary judgment, held:

> Finally, defendants question the amount of principal and interest due and owing on the notes, ... To support [this] contention, defendants rely on their affidavits which merely reflect defendants' "doubts" about Mercantile's computation of principal and interest ... By failing to aver specific facts explicitly showing Mercantile's calculations were improper and by relying upon mere "doubts" and speculations, defendants failed to raise any issue of material facts about the calculation of defendants' debts. (citations omitted).

Defendants' affidavit filed in opposition to plaintiff's motion for summary judgment merely indicates that they doubt plaintiff's computation of interest. Such "doubt" does not raise any issue of material fact.

Defendants also argue that a genuine issue of material fact remains as to whether $42,294.27 is a reasonable attorneys' fee and whether such fee was an expense necessarily incurred by plaintiff in furtherance of collection of the note.

In support of its motion for summary judgment, plaintiff filed the affidavit of Robert B. Paden, an attorney, who stated that he was familiar with the reasonableness of attorneys' fees in connection with collection and foreclosure matters; that it was his opinion that a fee in the amount of 10% of principal and interest, in this case the sum of $42,294.27, would be a reasonable fee; and that said fee was reasonable in light of: (1) time and labor required in preparing the lawsuit and defending against counterclaims, (2) the likelihood that neither plaintiff's counsel nor affiant would ever be employed by defendants because of this lawsuit, (3) the amount due on the note, and (4) time limitations and requirements imposed on counsel.

Defendants counter the motion for summary judgment with the affidavit of Tom Oswald, defendants' counsel on this appeal, which states that the sum of $42,294.27 is not due and owing as attorneys' fees for the plaintiff's expenses of collection of the note, and that 10% of principal and interest, or $42,294.27, is not a reasonable attorneys fee.

■ Defendants' argument fails for two reasons. First, the reasonableness of attorneys' fees is a matter of law to be decided by the court. *Carondelet Savings & Loan Assoc. v. Boyer*, 595 S.W.2d 744, 748 (Mo.App.1980). Therefore, even if defendants challenge the reasonableness of the fee by affidavit, such does not raise a genuine issue of fact.

■ Second, the trial court is an expert in the reasonableness of attorneys' fees, and its judgment as to an award of such fees shall only be modified upon a finding of a manifest abuse of discretion. *Empire Gas Corp. v. Small's LP Gas Co.*, 637 S.W.2d 239, 248 (Mo.App.1982). Defendants argue that by plaintiff's own admission, the fee charged represented labor and time spent by counsel defending the counter claim, and that under the note defendants only agreed to be liable for reasonable attorneys' fees and costs expended in the process of collection of the note. Defendants point out that an affidavit filed by plaintiff's counsel states that a total of 190.6 hours of time had been expended in the collection of the note and that therefore, counsel was charging approximately $221.90 per hour, and that such a fee is excessive and unreasonable.

■ In *Ozark Production Credit Assoc. v. Walden*, 695 S.W.2d 919, 922 (Mo.App. 1985), the court held that an attorneys' fees of 10% of a promissory note, or $15,702.06, for attempting to collect the promissory note for the bank was not excessive, notwithstanding the claim that the attorney spent no more than 15 hours in attempting to collect the note. (Such a fee would result in an hourly fee of $1,046.80, considerably more than the hourly fee in the present case which defendants charge is excessive.) Attorneys' fees of 10% of a

note have been approved in numerous Missouri cases. *See Emmons v. Winters,* 627 S.W.2d 904, 907 (Mo.App.1982). Defendants have not shown a manifest abuse of discretion.

Defendants' point (1) is ruled against them because there were no genuine issues of material fact and summary judgment was therefore proper.

For their point (2), defendants charge that the trial court erred in overruling their motion to strike the affidavits of Merrill "Tony" Hamilton, Gerald Goodin, Wendell Koerner and Robert Paden, filed by plaintiff in support of its motion for summary judgment, because the affidavits were defective under Rule 74.04. Defendants' argument for their point (2) is nothing more than a conglomeration of citations, followed by an exhausting list of alleged classes of defects contained in each affidavit without identifying the specific items that are complained of.

Because defendants' allegations have no merit and because they are so numerous, (23 defects alleged in four affidavits) this court will not set forth and examine each allegation as such would serve no purpose. Rather, this court will examine each affidavit and determine whether it is sufficient under the rules as proscribed by our supreme court.

Rule 74.04(e) states in part:

**Form of Affidavits-Further Testimony-Defense Required.** Supporting and opposing affidavits shall be made on *personal knowledge, shall set forth such* facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

(1) Affidavit of Merrill Hamilton:

 The affidavit states that it is made of the personal knowledge of affiant.

The affidavit sets forth that affiant is custodian of the records of plaintiff including records relating to defendants' loan account; that defendants executed the note in question in affiant's presence; that the note and security agreement in question were prepared by plaintiff's employees in the regular course of business and that affiant presented the document to defendants for review and signatures; that the payment schedule was prepared by plaintiff's employees in the regular course of business; that the personal guaranty of defendants was prepared by plaintiff's employees in the regular course of business; that the promissory note is in default; and that affiant has examined the documents referred to and that the principal sum of $311,347.74 and $111,595.04 interest is outstanding on the note with $132.22 interest accruing per day. The foregoing facts would be admissible in evidence.

The affidavit sets forth that the affiant is competent to testify to these matters in that he is over 18 years of age and vice-president of plaintiff bank.

Attached to the affidavit are copies of the promissory note, security agreement, guaranty and payment schedule referred to in the affidavit and affiant states that all are true and correct copies of the mentioned documents.

This court holds that the affidavit of Merrill Hamilton is sufficient under Rule 74.04(e) and that the defendants' allegations have no merit.

(2) Affidavit of Gerald Goodin, Jr.:

The affidavit states that it is made of the personal knowledge of affiant.

The affidavit sets forth that the records of plaintiff bank reflect that on January 11, 1983, defendants executed a promissory note in the amount of $550,000.00; that pursuant to the terms of the note defendants have agreed to pay reasonable attorneys' fees and expenses for collection of the note should the note go into default; that the note is now in default; that affiant agreed, on behalf of plaintiff, with plaintiff's counsel that said counsel would receive 10% of any sums collected by counsel on the note; and that 10% of principal and interest due under the note would result in a fee of $42,294.27. The foregoing facts would be admissible in evidence.

The affidavit sets forth that affiant is competent to testify to these matters in that he is over 18 years of age and president of plaintiff bank.

The documents referred to in the affidavit (i.e., the note and payment schedule) were not attached to the affidavit but sworn copies were attached to the Merrill affidavit and were before the court and served upon defendants.

This court holds that the affidavit of Gerald Goodin, Jr. is sufficient under Rule 74.04(e) and that the defendants' allegations have no merit.

(3) Affidavit of Wendell E. Koerner, Jr.:

The affidavit states that it is made of the personal knowledge of affiant.

The affidavit sets forth that affiant is the attorney of record for plaintiff; that affiant is a licensed member of the Missouri Bar; that affiant has been practicing law for more than 17½ years; that affiant is entitled to a fee of 10% of the amount collected against the note; that in his experience as an attorney affiant is of the opinion that 15% is a reasonable fee collected in these types of cases; that according to records maintained in his office, affiant's and paralegal's time devoted to this case amounts to 190.6 hours; and that in affiant's opinion, 10% is a reasonable fee in this case. The foregoing facts would be admissible in evidence as would affiant's opinion as to the reasonableness of the fee because the facts as stated in the affidavit establish that affiant is qualified to state his opinion as to the reasonableness of attorneys' fees.

Affiant is competent to testify to these matters in that he is over 18 years of age and counsel of record representing plaintiff in this matter.

■ This court agrees with defendants that affiant does not attach documents referred to in the affidavit, i.e., time records. However, the trial court is free to disregard inadmissible portions of an affidavit and the affidavit does not fail in its entirety. That portion of the affidavit which refers to affiant's time records may be disregarded and the remainder of the affi-

davit is deemed sufficient under Rule 74.-04(e) and defendants' allegations have no merit.

(4) Affidavit of Robert B. Paden:

The affidavit states that it is made of the personal knowledge of affiant.

The affidavit sets forth that affiant is an attorney, licensed in the State of Missouri; that affiant has practiced law in rural Missouri since 1961 and that affiant is familiar with the reasonableness of attorneys' fees charged and collected in these matters; that affiant has been hired by plaintiff as local counsel in this case; that affiant has examined copies of the note and security agreement in question and that defendants have agreed to pay an attorney's fee of 10% of the note in question; that having examined the pleadings and discovery materials in this case, affiant is of the opinion that a fee of 10% of principal and interest due under the note is a reasonable fee; that having examined Missouri Bar Rule 4DR–107(B), affiant is of the opinion that a fee of 10% is a reasonable fee in this case.

■ Defendants argue that the affidavit fails for the reason that facts stated in the affidavit are inaccurate, specifically, that defendants agreed to pay a "reasonable" attorney's fee and that the affiant's statement that defendants agreed to pay a 10% fee is inaccurate. Defendants do not argue that such a statement would be inadmissible in evidence, and indeed it would be admissible. Rather, defendants challenge affiants credibility. Such an attack may be made by opposing affidavits and does not render the statement inadmissible, but merely affects affiant's credibility. This court holds that the facts stated in the affidavit would be admissible in evidence as would affiant's opinion as to the reasonableness of the fee because the affidavit sets forth facts which would render affiant qualified to state such an opinion.

Affiant is competent to testify in that he is over 18 years of age and is an attorney hired by plaintiff in this matter.

The documents referred to in the affidavit, (i.e., the note, security agreement, pleadings, and discovery materials) are not

attached, however, sworn copies of the note and security agreement were attached with the Hamilton affidavit and served upon the court and upon defendants. Furthermore, copies of the pleadings and discovery materials have been filed with the trial court and served upon defendants. This court holds that the affidavit is sufficient within the letter and spirit of Rule 74.04(e) and defendants' allegations are without merit.

Defendants' point (2) is ruled against them.

For their point (3), defendants charge the trial court erred in overruling defendants' motion for leave to file answers to plaintiff's request for admissions out of time.

On January 9, 1985, plaintiff served upon defendants a request for admissions. Defendants' answers to the request for admissions were not filed within the time allowed by Rule 59.01(a). The motion for summary judgment was filed on November 27, 1985. Defendants' motion for leave to file answers out of time was filed November 27, 1985.

The trial court held that "under all the circumstances that the motion [to file answers out of time] should be overruled because the late time in which this is requested and the Defendants (sic) would be prejudiced, so the Defendants' motion to file is overruled."

Under Rule 59.01(a), the matters of which an admission is requested are deemed admitted if no answer is filed within 20 days after service of the request. Rule 59.01(b) states in part:

Any matter admitted under this Rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. Subject to the provisions of Rule 62.01 governing amendment of a pre-trial order, the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits.

Rule 62.01 states in part:

In any civil action, the court may *in its discretion* direct the attorneys for the parties to appear before it for a conference to consider:

\* \* \* \* \* \*

(2) The necessity and desirability of amendments to the pleadings;

\* \* \* \* \* \*

(6) Such other matters as may aid in the disposition of the action.

(Emphasis added.)

The decision to allow or refuse defendants' request for leave to file answers out of time was within the discretion of the trial court. Defendants fail to show that the trial court abused that discretion. Defendants' point (3) is ruled against them.

The order of summary judgment in favor of plaintiff is in all respects affirmed.

Plaintiff challenges the judgment in favor of defendants on defendants' counterclaim and raises eight points of error. Because of the disposition of plaintiff's point (1), this court does not reach or decide plaintiff's remaining points.

For its point, plaintiff charges that the trial court erred in overruling plaintiff's motion for a directed verdict on defendants' counterclaim because defendants failed to make a submissible case in that (a) the evidence was insufficient to prove that the negotiations between Price and Ed Stiles amounted to a valid business expectancy; (b) the evidence was insufficient to prove that plaintiff intended to interfere with the alleged business expectancy, or that plaintiff's conduct was wrongful; and (c) the evidence was insufficient to prove plaintiff's conduct was without justification.

In reviewing the submissibility of defendants' counterclaim, this court must view the evidence in the light most favorable to defendants, giving defendants the benefit of all favorable inferences reasonably drawn from the evidence, and disregarding plaintiff's evidence that does not

support defendants' case. *See Hansome v. Northwestern Cooperage Co.*, 679 S.W.2d 273, 274 (Mo. banc 1984). If the evidence is such that reasonable minds could reach different conclusions, then the motion for directed verdict cannot be sustained. *Losh v. Ozark Border Electric Co-op*, 330 S.W.2d 847, 851–52 (Mo.1960).

▮ Interference with contractual or business relations is a tort recognized in Missouri. This was declared by our supreme court in *Downey v. United Weatherproofing*, 363 Mo. 852, 253 S.W.2d 976 (1953), which held that in order to make a submissible case, a claimant must establish: (a) a contract or valid business relationship or expectancy; (b) knowledge by the defendant of the contract or relationship; (c) intentional interference by defendant which induces the breach of contract or relationship; (d) the absence of justification; and (e) resulting damages. *See also Francisco v. Kansas City Star Co.*, 629 S.W.2d 524, 529 (Mo.App.1981).

In the present case, the evidence was that Ed Stiles had spoken with Price on several occasions, that Price was interested in purchasing defendants' cattle, that Ed and Price had discussed terms of price, number and quality of cattle, and that Price was of the opinion that defendants' cows would meet his needs, but that Price had not yet agreed to purchase the cattle.

▮ Although most cases involving tortious interference with contractual relations have involved existing contracts, a formal contract is not required to find a valid business expectancy. *Downey, supra* 253 S.W.2d at 980; *Cook v. MFA Livestock Assoc.*, 700 S.W.2d 526, 528 (Mo.App.1985); and *Francisco, supra*. However, no standard or test has been established to determine when a business expectancy might arise.

Plaintiff urges this court to adopt the standard set by *Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.*, 361 So.2d 769, 772 (Fla.Dist.Ct.App.1978), wherein that court held that the plaintiff therein had acquired no legal rights under the supposed business relationship, and that "[a] mere offer to sell a business which the buyer says he will consider, does not by itself give rise to legal rights which bind the buyer or anyone else with whom he deals." Such a rule is too restrictive given that Missouri cases have recognized instances wherein a valid business expectancy exists with neither buyer nor seller having acquired legal rights binding one or the other. For example, in *Rusk Farms, Inc. v. Ralston Purina Co.*, 689 S.W.2d 671 (Mo.App.1985), the court found a valid business expectancy to exist where there had been an on-going business relationship in years past but at the time of the alleged interference, neither plaintiff nor the prospective purchaser had acquired any legal rights as regards their continued business relationship. This court rejects plaintiff's suggestion to adopt the standard set in *Lake Gateway Motor Inn, supra.*

The evidence in the present case indicates that defendants and Price were in the process of negotiating a contract. It is not necessary to decide whether or not the evidence is sufficient to show a valid business expectancy because this court finds the evidence to be insufficient to show that the bank interfered as explained below.

Plaintiff next charges that there was not sufficient substantial evidence that plaintiff intentionally interfered with defendants' valid business expectancy. This court agrees.

The evidence, viewed in the light most favorable to defendants, is that defendants' business had been losing money for the past three years, that defendants had defaulted on a $550,000.00 note, that the note was secured by personal property which included defendants' cattle, and that defendants were in severe financial condition. Plaintiff had a legal right to insist that defendants sell cattle and apply the proceeds to the note. Plaintiff had a legal right to request a deed of trust on defendants' real estate to secure the note before the note could be renewed.

▮ The evidence, even viewed in the light most favorable to defendants, indicates that plaintiff did not know the identity of the prospective purchaser and plain-

tiff had no contact with said prospective purchaser. Nowhere in the testimony do defendants claim that plaintiff refused its permission to allow defendants to sell the cattle to Price. In fact, defendants testified that plaintiff's employee, Brod, told defendants that the proposed sale sounded like a good deal and that defendants could sell the cattle. Defendants testified that they knew that if they sold the cattle to Price and turned the proceeds over to the bank, that plaintiff would lose its interest in the cattle, and plaintiff would have no legal rights as to whether defendants kept and cared for the cattle for the eight or nine months proposed by Price.

The statements attributed to plaintiff which defendants charge amounted to wrongful interference are that Brod told defendants Ed and Harley Stiles that they could go ahead and sell the cattle to Price but that defendants could not guarantee that they could care for the cattle for the eight or nine months because they might not be in business that long. Defendants also testified that Brod insisted on a 60–day deed of trust on defendants' real estate before the note could be renewed. Defendants argue that these statements were made with the intent to coerce defendants into terminating negotiations with Price and to coerce defendants into giving a deed of trust to plaintiff.

The person claiming tortious interference has the burden of proving that the other party actively and affirmatively took steps to induce the breach and that the expectancy would have come to fruition but for the actor's improper conduct. *Community Title Co. v. Roosevelt Federal Savings & Loan Assoc.*, 670 S.W.2d 895, 905 (Mo.App.1984), and *Francisco, supra*, 629 S.W.2d at 530. Defendants fail to meet this burden.

Defendants' evidence is devoid of any proof that plaintiff actively and affirmatively took steps to induce defendants to terminate their negotiations with Price. Defendants admit that Brod said they could sell the cattle. Defendants testified that they knew plaintiff could refuse its permission to sell the cattle but if permission was granted, plaintiff would have no control over whether defendants cared for the cattle. The evidence is uncontroverted that defendants could have consummated the transaction with Price. Brod's statement that defendants might not be in business long enough to care for the cattle was nothing more than business advice.

Having failed to establish an essential element of their counterclaim, this court holds that the trial court erred in overruling plaintiff's motion for directed verdict and the judgment in favor of defendants' on their counterclaim for tortious interference with a valid business expectancy must be reversed.

That portion of the judgment which granted judgment to plaintiff by entry of summary judgment on Counts I and II and the award of attorneys' fees in the sum of $42,294.27 is in all respects affirmed. That portion of the judgment awarding to defendants the sum of $75,000.00 in actual damages and the sum of $400,000.00 in punitive damages is in all respects reversed. The cause is remanded and the trial court is instructed to enter judgment in favor of plaintiff and against defendants on defendants' counterclaim.

All concur.