John E. BELL, Appellant,

v.

**THE MAY DEPARTMENT STORES COMPANY, d/b/a/ Famous–barr Company, a corporation, Respondent.**

No. SC 81719.

Supreme Court of Missouri,
En Banc.

Nov. 23, 1999.

Charles W. Bobinette, Richard B. Blanke, St. Louis, for Appellant.

Betty Thorne Tierney, David R. Levy, St. Louis, for Respondent.

Samuel E. Overfelt, Jefferson City, Arthur L. Herold, Frank M. Northam, Washington, DC, for Amicus Curiae.

RONNIE L. WHITE, Judge.

John E. Bell appeals from summary judgment entered against him and in favor of Respondent, the May Department Stores Company, d/b/a/ Famous Barr Company ("Famous Barr") on April 14, 1997. The trial court entered summary judgment on Count I of Bell's petition, which claims Famous Barr violated the Truth in Lending Act, 15 U.S.C. section 1666, *et seq.*, and Regulation Z, specifically 12 C.F.R. section 226.13. The trial court also entered summary judgment on Count II of Bell's petition, which claims Famous Barr tortiously interfered with Bell's credit expectancy. We reverse and remand.

## I. Factual Background

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[1] On appeal, we review the record in the light most favorable to the party against whom judgment was entered.[2] Our review is essentially *de novo*.[3]

A review of the record yields the following facts and reasonable inferences therefrom in the light most favorable to Bell. Bell purchased a ceiling fan on August 2, 1992, at Famous Barr and charged the purchase price of $132.16 to his Famous Barr credit card account. After installing it a few weeks later, Bell determined the fan was defective because it made an unacceptable level of noise at all speeds and he was unable to fix it. Famous Barr never inspected the fan to dispute Bell's determination.

Famous Barr billed Bell for the cost of the fan on September 1, 1992, with payment due on September 25. On or about September 23, 1992, Bell told a Famous Barr representative his fan was defective and he did not intend to pay for it. Bell also sent Famous Barr a letter memorializing this conversation, dated October 27, 1992, following the directives on the back of his Famous Barr billing statement[4] and making a general reference to "Regulation Z." Famous Barr wrote Bell acknowledging its receipt of his letter.

Famous Barr later contacted Bell in November and agreed to locate a replacement fan and reimburse Bell for the installation cost. They never discussed the details, nor did they agree when Bell should ultimately pay for the fan. Bell waited for Famous Barr to locate a replacement fan and notify him, but he was never notified.

Bell again notified Famous Barr when his November 1992 statement contained a past due notice for the unpaid fan. Famous Barr assured Bell it had simply made a mistake. From May through October 1993, however, Bell's monthly statement showed past due notices, late fees, and finance charges. Except for the disputed price of the fan, Bell *always* paid his balance in full each month. On May 4, 1993, Famous Barr informed Bell it was sending his account to three credit report-

---

1. Rule 74.04(c).

2. *ITT Commercial Finance v. Mid–Am. Marine*, 854 S.W.2d 371, 376 (Mo. banc 1993).

3. *Id.* at 381.

4. The reverse side of the billing statement provides, in pertinent part:

    If you think your bill is wrong..., write us on a separate sheet of paper and mail it to the address below as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared....

    You do not have to pay any amount in question which we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you are delinquent or take any action to collect the amount in question....

    If you have a problem with the quality of goods ... that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the goods....

ing agencies, including TRW.[5] It made similar written threats to Bell and reports throughout the summer and threatened to report the most derogatory rating of "R9." Bell contacted Famous Barr to explain the dispute numerous times. He was assured no further action would be taken to collect the disputed amount and that the matter would not affect his credit rating.

Famous Barr used a computer billing system that automatically generated billing statements, dunning notices, and derogatory reports to credit agencies. If Famous Barr determined there was a legitimate dispute regarding the quality of a product, then it would not suppress the reporting of information to a credit agency. If negative information were reported erroneously, then Famous Barr would have to contact the credit agencies directly to delete it.

In August 1993, the parties reached a provisional settlement agreement. Famous Barr agreed to credit Bell's account with all finance and late fee charges and reinstate his credit line. Bell agreed to pay for the fan if Famous Barr sent a letter permitting the imminent buyer of Bell's house to exchange the fan. Nevertheless, on September 1, 1993, Famous Barr assessed late fees and finance charges for nonpayment, closed Bell's account, and reported derogatory information to the credit reporting agencies.

After memorializing this settlement agreement and sending a copy to Famous Barr on September 13, 1993, Bell received written confirmation that Famous Barr would "delete all derogatory information." On October 4, 1993, Bell re-dated his September 1993 letter and mailed it with a check for the price of the fan. Later that month, however, Bell found his Famous Barr account closed due to "poor prior payment history." Bell wrote a letter to Famous Barr quoting the pertinent sections of Regulation Z and demanding the deletion of adverse or derogatory credit history from his file. Famous Barr reinstated Bell's account, faxed letters to the credit reporting agencies to that effect, and sent Bell a copy. The parties later discovered the corrective letters that Famous Barr sent to the credit reporting agencies contained the wrong account number.

In early summer 1994, Bell applied to the European American Bank ("EAB") for a TWA credit card, hoping to earn frequent flyer miles with his purchases. EAB refused to extend credit based upon derogatory Famous Barr information contained in a credit report from TRW. TRW's report did not reflect Famous Barr's request to delete all derogatory credit information. Bell also discovered Famous Barr had requested other credit reporting agencies to delete his entire twenty-two year credit history with Famous Barr, the large majority of which was positive. Bell sued.

## II. Count I—Regulation Z of the Truth in Lending Act [6]

Count I in Bell's petition claims Famous Barr violated 15 U.S.C. sections

---

**5.** This letter stated in pertinent part:
THE PAYMENT PERFORMANCE OF YOUR FAMOUS–BARR ACCOUNT IS BEING REPORTED TO THE FOLLOWING CREDIT BUREAUS[:]
  CBI/EQUIFAX
  TRANSUNION CORPORATION
  TRW INFORMATION SERVICES
THIS MAY WELL AFFECT YOUR ABILITY TO OBTAIN OR RETAIN CREDIT ELSEWHERE.
IT IS URGENT THAT YOU FORWARD PAYMENT AT ONCE OR CONTACT [FAMOUS BARR] IMMEDIATELY.

**6.** Regulation Z is the name for Part 226 of Chapter 12 of the Code of Federal Regulations in which the Board of Governors of the Federal Reserve implemented the Federal *Truth in Lending Act* of 15 U.S.C. 1666 *et seq.* *See* 12 C.F.R. section 226.1.

The Court of Appeals, Eastern District, *en banc,* previously decided an appeal in this case in an opinion written by the Honorable Clifford H. Ahrens. Portions of this section are taken from that *en banc* opinion substantially verbatim.

1666(b)(3) & 1666a (1994) by reporting him delinquent to various credit reporting agencies after receiving notice of a "billing error" and prior to resolving that error. Count I also claims Famous Barr violated 15 U.S.C. sections 1666(b)(3) & (d) by restricting and closing his Famous Barr account after receiving notice of a "billing error" and prior to resolving that error.[7]

12 C.F.R. section 226.13(a)(3) defines a "billing error" as a "reflection on or with a periodic statement of an extension of credit for property or services *not accepted* by the consumer or the consumer's designee, or not delivered to the consumer or the consumer's designee as agreed."[8] Famous Barr argues the "billing error" alleged by Bell and essential to his claim did not occur because Bell accepted the fan. We apply state law to resolve whether Bell accepted it.[9]

In Missouri, Article 2 of the Uniform Commercial Code governs the acceptance of goods.[10] Acceptance occurs when the buyer: 1) after an opportunity to inspect the goods, informs the seller that the goods are conforming or that he will keep them despite their nonconformity; 2) fails to make an effective rejection; or 3) does any act inconsistent with the seller's ownership.[11] Famous Barr argues Bell accepted the fan because he did not reject it.

For an effective rejection, the buyer must notify the seller in accordance with the contract or within a reasonable time if the contract is silent.[12] The statute does not require written notice.[13] What constitutes a reasonable time for rejecting defective goods is a jury question when fair-minded persons could disagree.[14] Actions of the parties, such as assurances from the seller, also may affect what constitutes a reasonable time.[15] "If the buyer does not use the goods as his own, but rescinds the contract and holds the merchandise as bailee for the seller, the buyer is not liable for the sale price (assuming the rejection was justified)."[16]

A reasonable jury could find Bell did not accept the fan. He properly notified Famous Barr and Famous Barr duly received notice of the defective fan. Bell's rejection of the fan within three months of purchase was reasonable, especially since Bell did not install it until some weeks after he bought it and tried to fix it. Bell also notified Famous Barr of his rejection within the sixty-day period prescribed by both 12 C.F.R. section 226.13(b)(1) and Famous Barr's own billing statement. In addition, Bell did not commit acts inconsistent with Famous Barr's ownership of the rejected fan. Bell neither used the fan, nor prevented Famous Barr from removing it. Famous Barr even encouraged Bell to retain it pending replacement.

Also contrary to the decision of the trial court, summary judgment is improper because a reasonable jury could find Bell attempted to resolve his dispute with Fa-

7. If Famous Barr committed these violations, then it may be liable to Bell for actual damages, twice the amount of any finance charge, and the cost of the action and attorney's fees. 15 U.S.C. section 1640(a).

8. 12 C.F.R. 226.13(a)(3) (emphasis added).

9. *See* Official Staff Interpretations to 12 C.F.R. section 226.13(a)(3).

10. *See* section 400.2–606, RSMo 1994. All Missouri statutory references are to RSMo 1994 unless otherwise indicated.

11. *Id.*

12. Section 400.2–602.

13. *See id.*

14. *Grus v. Patton*, 790 S.W.2d 936, 940 (Mo. App.1990) (holding one year is not timely as a matter of law).

15. *Stephens Indus., Inc. v. American Express*, 471 S.W.2d 501, 504 (holding rejection ineffective after buyer possessed, used, and had goods serviced for more than 6 months).

16. *Paramount Sales Co., Inc. v. Stark*, 690 S.W.2d 500, 504 (Mo.App.1985) (finding buyer properly rejected goods).

mous Barr in good faith.[17] Bell claimed he long awaited the availability of a replacement fan and the parties dispute when they first agreed Bell would pay for it.

If a reasonable jury finds Bell did not accept the fan, and acted in good faith, then it can find a "billing error" existed. If a "billing error existed," Famous Barr violated the Federal Truth in Lending Act by closing Bell's account and reporting him to credit agencies. The decision of the trial court granting Famous Barr's motion for summary judgment on Count I is reversed.

### III. Count II—Intentional Interference with Credit Expectancy

Count II of Bell's petition claims Famous Barr intentionally interfered with Bell's credit expectancy by reporting false and negative information to credit agencies. This tort is one sort of intentional interference with a business expectancy and is comprised of the following elements: (1) a valid credit expectancy; (2) defendant's knowledge of the expectancy; (3) a denial of credit induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages.[18]

We find Bell presented genuinely disputed facts to meet each of these five elements so that a jury could find that Famous Barr intentionally interfered with his valid credit expectancy.

### A. Credit Expectancy

An expectancy is "that which is expected or hoped for."[19] To have valid credit expectancy one need not have a formal contract.[20] There must be, however, a reasonable expectation of obtaining credit.[21] This expectancy cannot be too indefinite or remote.[22]

The dispute in this case centers on whether Bell could have had valid credit expectancy at the time derogatory information was reported without having had a credit application pending with any creditor. Famous Barr argues the analysis of the court in Haas[23] and the facts of Franklin[24] suggest a pending credit application is necessary for credit expectancy as a matter of law. We disagree and hold no pending credit application is necessary for credit expectancy.

Bell presented undisputed evidence that he had a perfect credit history until

**17.** See Brown v. P.N. Hirsch & Co. Stores, Inc., 661 S.W.2d 587, 590–591 (Mo.App.1983) (stating in defamation action, "the question of malice or good faith ... is for the jury except when there is no substantial evidence to support such a finding).

**18.** See Rice v. Hodapp, 919 S.W.2d 240, 245 (Mo. banc 1996) (finding plaintiffs claim of intentional interference with a business relationship failed because defendant had an unqualified right to interfere); see also Franklin v. Mercantile Trust, 650 S.W.2d 644, 648 (Mo. App.1983) (holding plaintiff could make a claim of intentional interference with a contract based on his reasonable expectancy of receiving financing for loans).

**19.** Black's Law Dictionary 576 (6th ed.1990).

**20.** See American Bank of Princeton v. Stiles, 731 S.W.2d 332, 343 (Mo.App.1987) (finding no tortious interference with a contract because of insufficient evidence that defendant interfered).

**21.** See Killian Construction v. Jack D. Ball & Associates, 865 S.W.2d 889, 891 (Mo.App. 1993) (finding lowest responsible bidder for public project had protectable business expectancy of receiving contract).

**22.** Genovese v. DCA Food Industries, Inc., 911 F.Supp. 378, 380 (E.D.Mo.1996) (finding expectancy of an agreement with the Chinese government to develop and market products based on contacts with certain government officials too indefinite to support a business expectancy).

**23.** Haas v. Town and Country Mortgage Co., 886 S.W.2d 225 (Mo.App.1994)

**24.** Franklin v. Mercantile Trust, 650 S.W.2d 644, 648 (Mo.App.1983) (holding plaintiff presented sufficient evidence to defeat motion for directed verdict on claim for intentional interference with a business expectancy where defendant filed a derogatory report after plaintiff had a pending credit application).

Famous Barr reported derogatory information. He made $15,000.00 in credit card purchases per year on average, had financing for his home, and no creditor had ever reported him delinquent. He also had a credit account with Famous Barr for twenty-two years, which he paid in full every month. In addition, Bell never was denied credit until denied by EAB. Finally, Bell showed he repeatedly asked Famous Barr to remove derogatory information from his credit report. Although Bell had no credit application pending at the time Famous Barr reported derogatory information, a reasonable jury could find he had valid credit expectancy based on his longstanding clean credit history, and his efforts to keep it clean. This holding is consistent with the rule that no formal contract is required for valid credit expectancy.[25]

We stress that only a *valid* or *reasonable* expectancy of credit satisfies the test. Not only must plaintiff *expect* to apply for credit, but also plaintiff must have a *reasonable chance* of obtaining credit. What constitutes a reasonable chance of obtaining credit is usually a question of fact for the jury to decide where fair-minded persons could disagree. In this case, a reasonable jury could find Bell's chance of obtaining credit was reasonable by his credit report being devoid of any delinquency. We hold a reasonable jury could find Bell had valid credit expectancy.

Famous Barr argues we should follow *Haas v. Town and Country Mortgage Company* [26] to conclude Bell had no valid expectancy of credit because he had no credit application pending with EAB when Famous Barr reported derogatory information. In *Haas*, plaintiffs sought to buy a piece of property that was being foreclosed and assumed the mortgage from the owner. Plaintiffs were negligent by not inquiring about the eligibility requirements of the mortgage loan they assumed, and one week after closing defendant mortgag-

ee informed them they were ineligible because the loan was reserved for first time buyers. Defendant gave plaintiffs certain options, none of which plaintiffs exercised. Despite being advised by their own title company to make loan payments until the problem was resolved, plaintiffs missed payments. Consequently, defendant reported that plaintiffs were delinquent. Plaintiffs thereafter were denied credit and charged higher-than-normal interest rates on a car loan. The court of appeals reversed the judgment the trial court entered in favor of plaintiffs' claim for tortious interference with a business expectancy. It found "no evidence in the record that at the time [defendant] issued the credit reports that plaintiffs had established a business relationship either with any of the credit card companies which denied them credit or with the lender of the car loan." [27]

Despite similarities between *Haas* and the instant case, *Haas* does not control because of important factual differences. Unlike the instant case, in *Haas* there was no evidence defendant wrongfully reported derogatory information to credit card companies. Plaintiffs neglected to learn the eligibility requirements of their loan and they were advised to continue repaying the loan. It is reasonable to conclude the court rejected plaintiffs' claim of intentional interference with a business expectancy claim because defendant was justified in reporting the derogatory information—the fourth element of this tort claim.

Also unlike the instant case, in *Haas* there was no evidence of the strength of plaintiffs' credit history. It found plaintiff's "mere hope" of establishing a credit relationship "tenuous" and not "evinc[ing] the existence of a valid business relationship or expectancy." The court may have found that while plaintiffs had credit expectancy, they lacked a *valid* or *reason-*

---

**25.** *See, e.g., American Bank of Princeton v. Stiles,* 731 S.W.2d 332, 343 (Mo.App.1987).

**26.** 886 S.W.2d 225.

**27.** *Id.* at 228.

*able* expectancy. This language also suggests the court rejected plaintiff's claim because insufficient evidence showed defendant's actions caused plaintiffs' creditors to deny them credit—the third element of this tort claim.

Notwithstanding these factual differences, the court in *Haas* may have underappreciated the claim of tortious interference with credit expectancy. It ruled against plaintiffs because they had no "established" business relationship with a creditor. It considered the "mere hope" of establishing a credit relationship "tenuous" and not "evinc[ing] the existence of a valid business relationship or expectancy." The court incorrectly focused exclusively on an established business relationship. As explained above, a formal credit contract is not necessary for valid credit expectancy.[28] Expectancy is just that: hope. If that hope is reasonable, then plaintiff has valid credit expectancy. In neither its factual background nor its analysis did the court in *Haas* cite any evidence of plaintiffs' credit history. Nor did it consider the reasonableness or validity of plaintiff's hope of obtaining credit.

To the extent *Haas* and *Franklin* require a pending credit application in order to find valid credit expectancy, they are overruled.

## B. Knowledge of Credit Expectancy

The tort of intentional interference with credit expectancy "presupposes [defendant's] knowledge of the plaintiff's [expectancy], or at least facts which would lead a reasonable person to believe that such [expectancy] exists. Without such knowledge, there can be no intent and no liability."[29]

The evidence Bell presented shows a genuine dispute whether Famous Barr knew or should have known of his credit expectancy. In July 1993, Famous Barr wrote Bell one of a series of dunning letters threatening, "[Y]our credit bureau report will show a derogatory rating of R9 for the next seven years. This may result in denial when trying to obtain car loans, charge cards, apartment ʾ rental, home mortgage, and even employment." These letters permit an inference that Famous Barr believed Bell cared about the affect a derogatory rating would have on his ability to obtain credit and likely were attempts to encourage Bell to pay to avoid a derogatory report. In addition, Bell repeatedly notified Famous Barr of his receipt of these letters and asked it not to make derogatory reports. Finally, although plaintiff need not show defendant knew or should have known plaintiff's credit expectancy was *valid* or *reasonable*, it may be fairly inferred that Famous Barr knew or reasonably should have known of Bell's valid credit expectancy because his credit history with Famous Barr was perfect.

It is also irrelevant that Famous Barr could not have known Bell would apply specifically to EAB for credit. As noted above, there is evidence Famous Barr knew or reasonably should have known of Bell's more general credit expectancy.

## C. Intent and Causation

"The person claiming tortious interference has the burden of proving that the other party actively and affirmatively took steps to induce the breach and that the expectancy would have come to fruition but for the actor's improper conduct."[30] Bell must show both intent and causation.[31]

---

**28.** *See American Bank of Princeton v. Stiles,* 731 S.W.2d 332, 343 (Mo.App.1987).

**29.** W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* section 129, at 982 (5th ed.1987) (using "contract or interest" instead of [expectancy]").

**30.** *American Bank of Princeton v. Stiles,* 731 S.W.2d 332, 344 (Mo.App.1987).

**31.** *Id.*

Famous Barr had the requisite intent if it knew interference was certain or substantially certain to occur as a result of its actions, even if its express purpose was not to interfere.[32] The evidence Bell presented shows a genuine dispute whether Famous Barr had this intent or knowledge. Bell showed he disputed the bill for the fan, and that Famous Barr recognized and conceded this dispute. He repeatedly notified Famous Barr that, in light of the billing error, derogatory reports were wrongful. Famous Barr threatened to file and actually filed the reports anyway. Bell also presented evidence that derogatory information filed by Famous Barr remained on his credit report even after Bell paid for the fan. Finally, its dunning letters show Famous Barr knew these derogatory reports were detrimental to Bell's credit rating. Famous Barr claims its intent was negated by its attempts to correct the derogatory reports, by its automated reporting system, by its claim not to know how credit providers use credit reports, or by the cooperation of its employees. This evidence, however, merely shows a dispute of fact. A reasonable jury could find Famous Barr intended to interfere with Bell's credit expectancy, even if only by knowing the report was substantially certain to interfere.

The evidence Bell presented also shows a genuine dispute whether Famous Barr's derogatory report caused EAB to deny credit to Bell. Bell presented evidence EAB denied credit to Bell because of derogatory information on Bell's TRW-credit report. The only such derogatory information on that report was supplied by

Famous Barr. Bell also presented evidence Famous Barr continued, for a time, to report derogatory information even after promising to desist. Famous Barr does present evidence showing how it unsuccessfully tried to remove all derogatory information from Bell's credit reports. It is also undisputed Famous Barr never contacted EAB directly. This evidence, however, merely shows causation is disputed. In a light most favorable to Bell, a reasonable jury could find that but for Famous Barr's improper conduct, EAB would not have denied credit to Bell.

### D. Justification

"One may act in a manner that interferes with another's business expectancy if by so doing one is acting to protect one's own economic interests."[33] The evidence Bell presented shows a genuine dispute whether Famous Barr was justified in reporting derogatory information to protect its economic interests. Bell presented evidence he properly rejected the fan, Famous Barr promised to replace it but never did, and Famous Barr reported derogatory information while assuring Bell it did not expect payment. As explained in Part II above, a reasonable jury could find Famous Barr reported derogatory information while a billing error existed in violation of the Federal Truth in Lending Act.[34] As such, the actions of Famous Barr may not have been justified.[35]

### E. Damages

Famous Barr does not dispute that Bell was damaged when EAB denied him credit

**32.** *See Francisco v. Kansas City Star Co.,* 629 S.W.2d 524 (Mo.App.1981) (concluding plaintiff did not make a submissible case of intentional interference with a contract upon the element of intent) (quoting Restatement of Torts 2d, section 766, Comment j (1979)).

**33.** *Tri–County Retreading, Inc. v. Bandag, Inc.,* 851 S.W.2d 780, 785 (Mo.App.1993) (holding plaintiff's claim of intentional interference with a business expectancy failed because defendant's interference was justified to protect its economic interests) (quoting *O'Connor v.*

*Shelman,* 769 S.W.2d 458, 461 (Mo.App. 1989)).

**34.** *See* 15 U.S.C. section 1601 *et seq.*

**35.** *See Franklin v. Mercantile Trust Co.,* 650 S.W.2d 644, 649 (Mo.App.1983) (holding defendant was unjustified in publishing derogatory credit information that plaintiff was delinquent in payments if plaintiff properly rejected defective goods).

and the chance to earn TWA frequent flyer miles. We do not decide whether summary judgment is proper on Bell's claim for punitive damages in Count II because it was never reached by the trial court.

### IV. Conclusion

For the foregoing reasons, we reverse the judgment of the trial court and remand for further proceedings in accordance with this opinion.

PRICE, C.J., LIMBAUGH, HOLSTEIN, WOLFF and BENTON, JJ., and SCHAEPERKOETTER, Special Judge, concur.

COVINGTON, J., not participating.