William T. and Jeanie M. HENSEN,
Respondents,

v.

TRUMAN MEDICAL CENTER,
INC., Appellant.

No. WD 59135.

Missouri Court of Appeals,
Western District.

Oct. 30, 2001.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 4, 2001.

George David Porter, Kansas City, for appellant.

Brian Niceswanger, Overland Park, KS, for respondent.

PAUL M. SPINDEN, Chief Judge.

William T. Hensen sued Truman Medical Center for tortiously interfering with his employment relationship with REN Corporation–USA.[1] His wife, Jeanie Hensen, also sued Truman for loss of consortium. A jury awarded $250,000 in actual damages to William Hensen and awarded $50,000 in actual damages to Jeanie Hensen. Truman appeals. It asserts that the circuit court erred in denying its motion for a directed verdict or motion for a judgment notwithstanding the verdict because the Hensens did not make a submissible case on their tortious interference and loss of consortium claims. We affirm the circuit court's judgment.

The evidence established that in 1995 REN contracted with Truman to operate and to staff Truman's acute care dialysis unit. William Hensen had worked as a nurse for Truman for 13 years. Desiring to continue working in Truman's acute dialysis unit, Hensen terminated his employment with Truman in 1996 and began working for REN so that it could assign him to Truman's acute dialysis unit. REN understood that this was the basis for Hensen's accepting REN's employment, and REN complied with Hensen's desires by assigning him to Truman's unit.

On April 8, 1996, a female patient complained to Truman's staff that Hensen had raped and sodomized her while she was receiving dialysis at Truman's acute dialysis unit. Truman investigated the complaint but decided that it could not determine whether the patient's allegations were factual. Investigators discovered, however, that three Truman employees had reported that Hensen used what Truman labeled as "inappropriate language" and made "inappropriate comments about sexual topics in the workplace." Truman officials decided that the reported comments violated Truman's policy against sexual harassment. REN's contract with Truman required REN employees to meet the standards set forth in Truman's Guest Relations Policy, which required employees to "refrain from making offensive ... sexual remarks or jokes[.]" Moreover, because Hensen had been employed by Truman for 13 years before working for REN, investigators reviewed Hensen's personnel file and discovered that Truman had warned Hensen in 1987 about his use of inappropriate language in the workplace. Thus, after the investigation, Truman officials requested on May 8, 1996, that REN not assign Hensen to work at Truman.

On June 5, 1996, attorneys for REN sent attorneys for Truman a letter, which said:

> Be advised that REN Corporation has taken corrective action as to William T. Hensen based upon the claims of [Truman] employees that Mr. Hensen allegedly made sexually inappropriate comments to them or in their presence. The corrective action taken is based specifically on the allegation of sexually inappropriate comments as outlined in your letters to me dated May 13, and 24, 1996. Also taken into account was information from [Truman's] personnel file on Mr. Hensen for the period he was a [Truman] employee. As part of this corrective action, Mr. Hensen will be required to take a sensitivity training

1. REN merged with GAMBRO Health Care and began operating under the GAMBRO name. For the purposes of this opinion, however, we refer to it as REN.

course on the issue of sexual harassment. In the meantime, we intend to return Mr. Hensen to his full-time position at the acute care dialysis unit at Truman Medical Center. It is our anticipation that Mr. Hensen will be reassigned to another position in the Kansas City area when one becomes available—probably sometime later this year. From time to time, Mr. Hensen could be assigned to perform nursing services at our acute care dialysis unit at [Truman] on an on-call basis. Under all of the facts and circumstances in this matter, REN is of the opinion that this action is reasonable, appropriate and consistent with the contract between REN and [Truman], including [Truman's] Guest Relations Policy.

Truman officials responded by telling REN that it would not allow Hensen to return to work at Truman under any conditions.

Because REN did not have another acute dialysis unit in Kansas City in which to place Hensen, it sent him to Rolla to retrain him in chronic dialysis procedures. REN assigned him to a REN facility in St. Louis, then back to Rolla, and finally to a chronic dialysis unit in Kansas City. Hensen continued to work for REN until May 15, 1998, when REN terminated his employment for committing three patient care errors.

In February 1998, Hensen sued Truman for defamation, tortious interference with employment relationship, "outrage," and intentional infliction of emotional distress, and his wife sued Truman for loss of consortium. Hensen abandoned his outrage claim, and the circuit court granted Truman's motions for directed verdict on the defamation and intentional infliction of emotional distress claims. The circuit court, however, denied Truman's motions for directed verdict as to the tortious inter-

ference and loss of consortium claims. The jury returned a verdict for Hensen on his tortious interference claim and for Hensen's wife on her loss of consortium claim. Truman filed a motion for judgment notwithstanding the verdict, and the circuit court denied it. Truman appeals.

Truman contends that the circuit court erred in denying its motion for directed verdict at the close of all the evidence and its motion for judgment notwithstanding the verdict because Hensen did not make a submissible case on his tortious interference claim. We disagree.

■■■ A submissible case requires substantial evidence for every fact essential to liability. *Simpson v. Indopco, Inc.,* 18 S.W.3d 470, 473 (Mo.App.2000). Evidence is substantial if it has probative force on the issues, and a juror could reasonably rely on it to decide a case. *Id.* In determining whether a plaintiff made a submissible case, we review the evidence and all reasonable inferences in the light most favorable to the jury's verdict and disregard contrary evidence. *Seitz v. Lemay Bank and Trust Company,* 959 S.W.2d 458, 461 (Mo. banc 1998). "[We] will reverse the jury's verdict for insufficient evidence only where there is a 'complete absence of probative fact' to support the jury's conclusion." *Id.* (citation omitted). When reasonable minds can differ on a question put to a jury, the court may not disturb the jury's verdict. *Uptergrove v. Housing Authority of the City of Lawson,* 935 S.W.2d 649, 652 (Mo.App.1996). Whether evidence in a case is substantial and whether the inferences drawn are reasonable, however, are questions of law. *Davis v. Board of Education of the City of St. Louis,* 963 S.W.2d 679, 684 (Mo.App. 1998).

■■ "Tortious interference with a contract or business expectancy requires

proof of: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Rice v. Hodapp,* 919 S.W.2d 240, 245 (Mo. banc 1996). Hensen's burden was to adduce substantial evidence to support each element of his claim. *Kerr Construction Paving Company, Inc. v. Khazin,* 961 S.W.2d 75, 79 (Mo.App.1997). Truman asserts that Hensen did not establish the first four elements of his tortious interference claim.

Truman complains that Hensen did not present substantial evidence that it interfered with any employment relationship or expectancy between Hensen and REN. Truman asserts that, because Hensen was an at-will employee, such an employment relationship is insufficient to support a tortious interference claim.

■ That a contract of employment is "at-will" will not defeat an action for tortious interference. *Stanfield v. National Electrical Contractors Association, Inc.,* 588 S.W.2d 199, 202 (Mo.App.1979). "[I]n an action for interference with a contractual relationship, it is not necessary that there be a binding contract in existence, but a probable future business relationship from which there is a reasonable expectancy of financial benefits is enough." *Eib v. Federal Reserve Bank of Kansas City,* 633 S.W.2d 432, 435–36 (Mo.App.1982).

The issue, therefore, becomes whether Truman interfered with Hensen's employment relationship or expectancy with REN. The Supreme Court has defined expectancy as " 'that which is expected or hoped for.' " *Bell v. May Department Stores Company,* 6 S.W.3d 871, 876 (Mo. banc 1999) (quoting Black's Law Dictionary 576 (6th ed.1990)). The expectancy must also be valid or reasonable to prevail on a tortious interference claim. *See id.*

Hensen claims that his expectancy was to work at Truman as a nurse in the acute dialysis unit. Truman responds that, because REN retained the right throughout Hensen's employment to assign him to other facilities, Hensen had no valid expectancy to be assigned exclusively to work at Truman. Truman contends that, because Hensen kept his job with REN and was terminated for reasons unrelated to Truman, Truman could not have tortiously interfered with Hensen's employment relationship with REN.

■ REN's attorney testified that it hired Hensen for the purpose of assigning him as a nurse in Truman's acute dialysis unit. He admitted that he did not know whether Hensen's employment was exclusively for acute dialysis care at Truman, but he said that, "but for" Truman's directive, REN would have returned Hensen to work at Truman's acute dialysis unit at least until another position became available for him. The only other evidence concerning Hensen's employment relationship with REN was Hensen's testimony. He admitted that REN had the right to reassign him to facilities other than Truman; however, he testified:

> [REN officials] told me that I would work there predominantly, rarely in the chronic.
>
> Q. They told you that you would work there predominantly?
>
> A. Predominantly.
>
> Q. But they didn't tell you you would work there exclusively, did they?
>
> A. No, they did not.
>
> . . . .
>
> Q. [D]o you remember the testimony from [REN's attorney] that was read in this proceeding where [he] indicated he didn't know that you had any contract to be assigned exclusively at the Truman

Medical Center Acute Care Dialysis Unit; isn't that correct?

. . . .

A. I mean, he may have said that generally. I suppose he did say it generally.

. . . .

Q. And you didn't complain to REN that their reassignment of you into a chronic unit somehow breached your employment relationship with them, did you sir?

A. I let them know until they didn't seem interested anymore that I was not happy in the chronic unit.

Q. That wasn't my question. My question was, you didn't complain that it violated your contract of employment with REN, did you?

A. No I did not.

Q. Did anybody on your behalf say that that assignment in the chronic dialysis violated your employment with REN?

A. Not that I know of.

. . . .

Q. [I]t was REN's decision to reassign you to another facility in Kansas City, wasn't it?

A. I'm not sure whose decision. I was reassigned. I am not really sure how it all came about. They told me to go somewhere and I had a job. You know what I'm saying, sir?

Q. You had a job and they told you where to go, right?

A. That's right.

. . . .

Q. Would you have gone, made the jump to REN had you not been assured you would be working in the acute unit?

A. No.

. . . .

Q. And prior to Truman Medical Center's actions had there ever been any suggestion that you would not be allowed to continue in your work for REN at Truman in the acute unit?

A. No.

Q. In fact, your expectation based upon what your deal with REN was is that you would, in fact, stay there and continue working there; isn't that right?

A. That is right, a hundred percent.

This was sufficient evidence from which the jury could have concluded reasonably that REN and Hensen's business expectancy was that, even though REN retained the right to assign Hensen wherever REN chose, REN would place Hensen in Truman's acute dialysis unit predominantly.

Thus, when Hensen left Truman as an at-will employee, Truman's ability to react to Hensen's perceived misdeeds changed significantly. While Hensen was Truman's at-will employee, Truman enjoyed much latitude in acting on perceptions. When Hensen assumed employment with REN—albeit an at-will employee for REN—Truman became obligated not to interfere unjustifiably with any of Hensen's business expectancies in his new employment relation with REN.

Truman asserts, however, that it did not know about Hensen's employment relationship with REN—only that Hensen was an at-will employee with no exclusive assignment to Truman. Truman knew, however, that Hensen was working at Truman as REN's employee. Truman knew that REN wanted to return Hensen to its acute unit, and it knew that Hensen would have been returned to the unit had it not refused to permit REN to place him there. Substantial evidence existed from which the jury could have inferred reasonably that Truman had knowledge of Hensen's employment relationship with REN.

Next, Truman asserts that Hensen did not produce substantial evidence to establish that Truman's actions caused a breach of the relationship between Hensen and REN or—as the issue was put to the jury—that Truman caused REN to alter Hensen's employment relationship or expectancy. We disagree.

■ To determine whether Truman's actions caused the breach, the "but for" test is applied. *Fabricor, Inc. v. E.I. DuPont de Nemours and Company*, 24 S.W.3d 82, 93 (Mo.App.2000). To determine whether the "but for" test is met, courts use a two-step approach: Did the defendant actively and affirmatively take steps to induce the breach, and, if so, would the plaintiff's business expectancy been realized in the absence of the defendant's interference? *Id.* at 93–94.

The evidence established that Hensen was a highly skilled acute dialysis nurse, that REN hired him to work "predominantly" in Truman's acute dialysis unit, and that a significant portion of his income resulted from his acute care overtime, on-call, and acute care pay at Truman. The evidence further established that Truman refused to let REN place Hensen in Truman's acute dialysis unit and that, "but for" Truman's actions, Hensen would have retained his position and his level of earnings as an acute dialysis nurse at Truman. Because of Truman's actions, Hensen was required to work out of town and at a chronic dialysis unit, resulting in a significantly reduced level of earnings. Substantial evidence existed for the jury to conclude that Truman breached or altered Hensen's employment relationship with REN.

Finally, as to Hensen's tortious interference claim, Truman contends that Hensen did not establish that Truman acted without justification in refusing to allow REN to assign Hensen to Truman. Truman argues that it was justified in blocking REN's assigning Hensen to Truman because of Hensen's inappropriate and offensive sexual language in the workplace and that it was obligated by law to do so.

■ "Without justification" has been defined in this context as "the absence of any legal right to take the actions which form the basis of the claim." *Macke Laundry Service Limited Partnership v. Jetz Service Company, Inc.*, 931 S.W.2d 166, 181 (Mo.App.1996). Generally, conduct lacks justification when a defendant uses, to the plaintiff's detriment, an "improper means" to further the defendant's interests. *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 317 (Mo. banc 1993). A means is improper if it involves acts that are "independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Id.*

Truman contends that the evidence was "undisputed" that Hensen admitted making crude sexual comments to Truman employees and that Hensen had engaged in illegal sexual harassment in the workplace that offended Truman employees. Truman's contention is wrong. The evidence was in dispute. In regard to Hensen's comments to other Truman employees, Hensen testified:

Q. [W]hen you were asked about engaging in sexual commentary, you admitted you had engaged in sexual talk in the workplace, didn't you?

A. I admitted to—I was never given a definition and I—well, I admitted to light humor.

. . . .

Q. In your statement of April 16, 1996, you admitted engaging in conversations regarding sexual matters on the premises of Truman Medical Center?

A. In a light-hearted way.

Q. But my question is, you engaged—you admitted to engaging in the conduct no matter how you characterize it?

A. Yes.

Q. And, in fact, in the process of this litigation you have admitted to speaking about sexual matters with Jennifer Haney; isn't that correct?

A. In 1987, that is when that occurred, and I was disciplined for it.

Q. But my question is, sir, did you admit to engaging in discussing sexual matters with Jennifer Haney in the course of this litigation?

A. Yes, right, and I was previously disciplined[.] ... I was disciplined for it in 1987, the admitted allegation in this courtroom.

Q. And I am going to get to the 1987 situation here in just a moment, Mr. Hensen. My next question, though, is you also in the course of this litigation have admitted to having discussions regarding sexual matters with Barbara Talman; isn't that correct?

A. In a light-hearted way again.

Q. My question to you, sir—

A. That is correct.

Q. —you have admitted to engaging in discussions of sexual topics with Barbara Talman?

A. In a light-hearted way, yes.

Q. That is your interpretation, isn't it?

A. That is right.

This testimony does not amount to an admission by Hensen that he made "crude sexual comments to Truman employees." Hensen admitted only to engaging in discussions of sexual topics and in conversations regarding sexual matters. Conversations about sexual matters do not necessarily equate to sexual harassment. It was a matter for the jury to decide.

■■■ The only other testimony regarding the nature of Hensen's conversations about sexual matters with Truman employees was by Truman's attorneys regarding their investigation of Hensen and by Suzanne Haug, director of Truman's guest relations. Truman's attorneys offered hearsay testimony [2] at trial that Truman employees had told them during the investigations that Hensen had engaged in inappropriate sexual conversations. Haug testified that one employee referred to Hensen as "a dirty old man" and that another employee mentioned that she would not be surprised if a harassment complaint had been brought against Hensen. No Truman or REN employee testified that they had witnessed any offensive language or conduct by Hensen. Besides Haug, the Truman employees who did testify said that Hensen never said or did anything offensive. The jury heard the testimony of Hensen, Truman's attorneys,

---

**2.** Initially, Hensen objected on the grounds of hearsay to testimony by Stan Davis, Truman's attorney involved in the investigation of the complaints against Hensen, about what other employees had told him. Truman responded by saying that it was not offering the testimony for the "truth of matter" but to show why the attorney did what he did. The circuit court said that the testimony would be received for that limited purpose but "not for the truth of the statement." When Truman asked about what the employees specifically told the attorney, the circuit court sustained Hensen's hearsay objection. On cross-examination, however, Hensen elicited from Davis the same hearsay evidence including the specifics about what one employee said. Hearsay, if not objected to, may be considered by the jury, and the jury may give it whatever weight it deems appropriate. *Rooney v. Lloyd Metal Prod. Co.*, 458 S.W.2d 561, 566 (Mo. 1970).

and other witnesses and judged their credibility. Had Trumans presented the witnesses to whom Hensen made the comments, rather relying merely on Truman's attorneys and Haug, the posture of the case might have been somewhat different. As it is, although Truman asserts that its actions against Hensen were justified, the matter was for the jury to decide, and the jury concluded otherwise.

Truman relies heavily upon *Rice v. Hodapp*, 919 S.W.2d 240 (Mo. banc 1996), as support for its contention that it had an absolute legal justification to act on its requirement to investigate and to take action regarding the alleged offensive conduct by Hensen. In *Rice*, the plaintiff was transferred to another department as a result of a sexual harassment investigation, and he sued his supervisors for tortious interference. The supervisor countered that they and the company were legally obligated to investigate the complaints of sexual harassment and take remedial measures. *Id.* at 245. The Supreme Court affirmed the circuit court's granting of summary judgment and said:

> [Defendants] argue they were justified in investigating the charges of sexual harassment and in transferring Rice. Both state and federal law require investigation of sexual harassment claims in the workplace, as well as a system to communicate disapproval of sexual harassment. See § 213.010 RSMo 1986; 42 U.S.C. §§ 2000e to 2000e–17; 29 C.F.R. § 1604.11(f) (1995). A requisite element of tortious interference with a business relationship is absence of justification. *Nazeri*, 860 S.W.2d at 316–17. A defendant cannot be held liable for interfering with a business relationship if it has an unqualified right to perform the act. *Id.* at 317.

*Id.*

Unlike Hensen's case, however, the underlying facts were not in dispute in *Rice*.

Although the plaintiff in *Rice* "vehemently contend[ed] that the underlying facts d[id] not support the conclusion that he committed sexual harassment[,]" he did not dispute the underlying facts. *Id.* at 244 (emphasis added). The undisputed evidence established that the plaintiff in *Rice* "frequently 'hip-checked' coworkers, offensively touched female coworkers, kissed a coworker and used profanity." *Id.* at 242. The Supreme Court, therefore, affirmed the circuit court's granting of the defendants' motion for summary judgment on the tortious interference claim because the plaintiff could not prove that, in light of these undisputed facts, the defendants acted without justification. Hensen admitted to having conversations with other Truman employees regarding sexual matters, but he did not admit to making the specific comments reported by Truman's employees to Truman's attorney. Thus, unlike *Rice*, a genuine issue of material fact existed as to the nature of the sexual comments made to the other employees. *Rice*, therefore, does not aid Truman.

 Truman also asserts that it was acting under a qualified privilege to protect its economic and business interests. "A qualified privilege extends to 'all statements made bona fide in performance of a duty, or with a fair and reasonable purpose of protecting the interest of the person making them, or the interest of the person to whom they were made.' " *Fleischer v. Hellmuth, Obata & Kassabaum, Inc.*, 870 S.W.2d 832, 838 (Mo.App. 1993) (quoting *Kennedy v. Kennedy*, 819 S.W.2d 406, 410 (Mo.App.1991)). A qualified privilege protects, however, only to the extent that a defendant acts in a reasonable manner and for a proper purpose. *Century Management, Inc. v. Spring*, 905 S.W.2d 109, 112 (Mo.App.1995). "Unreasonable use of a privilege for an improper purpose, such as perpetrating a deliberate lie, will forfeit the privilege." *Id.* Hensen

presented substantial evidence that the jury apparently believed that Hensen did not engage in any offensive language or conduct. Accordingly, Truman was not entitled to a qualified privilege for its actions.

Truman also asserts that it had a contractual right to request that REN not assign Hensen to work at Truman. In particular, it contends that the contract between Truman and REN required REN employees to meet the standards set forth in Truman's Guest Relations Policy.[3] Truman's attorney testified that Hensen's sexual comments violated the Guest Relations Policy, which required employees to "refrain from making offensive ... sexual remarks or jokes." Again, however, it was an issue for the jury to determine whether Truman acted without justification in refusing to allow REN to assign Hensen to work at Truman in light of the allegations against Hensen of inappropriate sexual comments in the workplace. Hensen presented substantial evidence that the jury apparently believed that Truman's actions were without justification.

In its last point, Truman contends that the circuit court erred in denying its motion for directed verdict at the close of all the evidence or the motion for judgment notwithstanding the verdict on Jeanie Hensen's loss of consortium claim. It bases its arguments solely on its contention that Hensen did not make a submissible case on his tortious interference claim. As we concluded, however, Hensen did make a submissible case on his claim, and his wife's loss of consortium claim was purely derivative of Hensen's claim. "A claim for loss of consortium depends for validity upon the claim of the spouse, from which it derives. If the injured person has no claim, then the spouse does not either." *Lovelace v. Long John Silver's, Inc.*, 841 S.W.2d 682, 685 (Mo.App.1992). The circuit court, therefore, did not err in denying Truman's motions for directed verdict or judgment notwithstanding the verdict as to Jeanie Hensen's loss of consortium claim.

We affirm the circuit court's judgment.

VICTOR C. HOWARD, Judge, and LISA WHITE HARDWICK, Judge, concur.

---

3. Truman relies on *Sisters of St. Mary v. Blair*, 766 S.W.2d 773 (Mo.App.1989), in support of its contention that it had an "unqualified contractual right" to seek to remove Hensen from Truman. In Sisters of St. Mary, however, the agreement between Sisters of St. Mary and St. Louis University's School of Medicine gave the Sisters of St. Mary an absolute right to terminate its agreement with the university, which resulted in the appellant's removal from the hospital. The Guest Relations Policy did not give Truman an absolute right to seek the reassignment of any REN employee working for Truman; instead, it required REN employees to meet the standards set forth in the Guest Relations Policy. Thus, Sisters of St. Mary is not instructive.